UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANETTE JENKINS,

                    Plaintiff,                    16-cv-6529

          - against -                             MEMORANDUM OPINION AND
                                                  ORDER
ACTING COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

JOHN G. KOELTL, District Judge:

     This appeal from a denial by the Acting Commissioner of

Social Security (the "Commissioner") of a claim for Supplemental

Security Income ("SSI") asks whether the Administrative Law

Judge (the "ALJ") overrode erroneously the opinions of three

treating medical sources. The answer is no.

     The plaintiff, Janette Jenkins, filed an SSI claim alleging

that depression, post-surgical pain in her right shoulder, pain

in her left leg, diabetes, high blood pressure, heart problems,

and high cholesterol prevent her from working. Tr. 182. Jenkins

claimed that her disability began on November 28, 2012. Tr. 161.

An ALJ found that Jenkins was ineligible to receive SSI because

she is not disabled within the meaning of the Social Security

Act. Tr. 6-44. On appeal, Jenkins argues that the ALJ failed to

accord sufficient weight to the opinions of three treating

medical sources—Dr. Julianne Suojanen, a psychiatrist; Dr.

Jennifer Toh, Jenkins's primary care physician who examined her

shoulder; and Dr. Jonathan Posner, a foot specialist—in violation of the so-called "treating source rule." See Shaw v. Chater, 221 F.3d 126, 132, 134 (2d Cir. 2000).[1] The parties have filed cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The Commissioner's motion is **granted**. The motion by Jenkins is **denied**.

## I.

The administrative record contains the following facts.

### A.

Jenkins was born on August 24, 1964. Tr. 161. She has some high school education, but she did not graduate and has never passed the GED exam. Tr. 51, 183, 250. Jenkins worked in a factory in the 1980s, as a temporary postal employee in 1989, and as a babysitter sporadically up to 2004. Tr. 55, 58, 182, 217, 250. Jenkins also served as a caregiver for her children when they were young. Tr. 187. Jenkins is married but has been separated from her husband for more than a decade. Tr. 54. Jenkins lives with her brother. Id.

Jenkins has experienced regular shoulder pain since at least December 2010. Tr. 275. Dr. Toh, Jenkins's primary care physician, has treated her shoulder. See Tr. 394, 409, 414, 430,

---

[1] While courts refer occasionally to this as the "treating physician rule," 20 C.F.R. § 416.902 provides that this rule applies to the opinion of any "acceptable medical source," including psychiatrists.

451, 468, 481, 523, 539, 565. Jenkins also has diabetes, which has caused her to suffer foot pain. Tr. 332-33, 412, 443, 483, 509, 553, 562, 577. Dr. Posner, a foot specialist, has treated Jenkins since 2011. Tr. 332-33.

On July 6, 2012, Jenkins underwent arthroscopic surgery to relieve adhesive capsulitis in her right shoulder. Tr. 238. Four days after her surgery, Jenkins informed Dr. Toh that her right shoulder pain did not subside. Tr. 390, 393. Dr. Toh prescribed more pain medication, Tr. 393, but Jenkins's right shoulder pain continued, see Tr. 439.

On January 29, 2013, Jenkins completed a function report (the "Function Report") in which she described her activities and limitations as follows: Jenkins is able to take care of her personal needs, hygiene, and medication without assistance. Tr. 190. She cleans and does laundry on her own, although she needs help mopping. Tr. 191. Jenkins helps her mother shop, do laundry, and attend doctors' appointments. Tr. 189. Jenkins leaves the apartment three to four times per week. Tr. 191. She uses public transportation and is capable of going out alone. Id. She is able to shop for herself. Tr. 192. Jenkins's hobbies are watching television and reading, which she does every day. Id. Jenkins socializes by talking on the phone daily and attending church every Sunday. Tr. 193. She has no problems paying attention, is capable of finishing what she starts, can

follow spoken and written instructions, and has not had any problems getting along with people in authority, Tr. 195, although she has some difficulty with her memory and gets depressed "sometimes." Tr. 196. Jenkins cannot lift more than fifty pounds with her right arm. Tr. 193. She has sciatica in her left leg, which prevents her from standing for extended periods. Id.

On January 30, 2013, Jenkins met with Dr. Marilee Mescon, a consultative physician who examined Jenkins's shoulder. Tr. 254-58. Jenkins told Dr. Mescon that she experienced pain in her right shoulder after her July 2012 surgery. Tr. 254. Jenkins assigned the pain a score of 7 out of 10 without medication and 3 out of 10 with medication. Id. Dr. Mescon observed that Jenkins had no musculoskeletal issues and had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally. Tr. 256. Dr. Mescon also concluded that Jenkins had no limitations on her ability to sit, stand, climb, push, pull, or carry heavy objects. Tr. 257. In Dr. Mescon's view, Jenkins's overall prognosis was "fair." Id.

That same day, Jenkins met with Dr. David Mahony, a consultative psychologist. Tr. 250-53. Jenkins traveled alone on the bus to meet Dr. Mahony. Tr. 250. Jenkins denied any psychiatric hospitalization or outpatient treatment. Id. She reported having a normal sleep pattern and a normal appetite.

Id. Jenkins told Dr. Mahony that she gets depressed and experiences crying spells "sometimes." Tr. 251. Dr. Mahony observed that Jenkins was cooperative, "dressed casually and casually groomed," and coherent and goal oriented. Id. Dr. Mahony found "no evidence of hallucinations, delusions, or paranoia." Id. He found that Jenkins "can follow and understand simple directions and instructions" and that she "can maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks, make appropriate decisions, relate to others, and deal with stress." Tr. 252. Dr. Mahony concluded that Jenkins's psychiatric symptoms "do not seem to interfere with [her] ability to function on a daily basis." Id.

On March 7, 2013, Jenkins sought mental health treatment at the Montefiore Comprehensive Family Care Center ("Montefiore Medical Center"). Tr. 470-73. Jenkins was diagnosed with depression and anxiety and referred to a psychiatrist.

On April 24, 2013, Dr. Toh completed a questionnaire regarding Jenkins's physical capability to perform work-related tasks (the "Shoulder Health Questionnaire"). Tr. 637-40. Dr. Toh based her answers on at least seven meetings she had with Jenkins between May 2012 and February 2013. Tr. 375, 390, 425, 438, 447, 486, 503. In the Shoulder Health Questionnaire, Dr. Toh reported that Jenkins was limited to lifting less than ten pounds. Tr. 637, 638. Dr. Toh found that Jenkins can reach only

occasionally, but has no limitations standing, walking, handling, fingering, or feeling. Tr. 637, 639.

On April 30, 2013, Jenkins met with Dr. Suojanen, a psychiatrist from Montefiore Medical Center, for a mental health examination. Tr. 580-83. This was the first time Dr. Suojanen treated Jenkins. Tr. 580. Dr. Suojanen diagnosed Jenkins with depression and grief reaction and prescribed Jenkins sertraline, a generic form of Zoloft. Tr. 582-83.

On May 2, 2013, Dr. Suojanen completed a questionnaire regarding Jenkins's psychiatric state based on the April 30 examination (the "Mental Health Questionnaire"). Tr. 641-46. In Part A of the Mental Health Questionnaire, Dr. Suojanen reported the following: Jenkins had a Global Assessment of Functioning ("GAF") score of 60. Tr. 641.[2] Jenkins experienced symptoms of depression, tearfulness, periods of anxiety, lack of energy and motivation, anger, and low self-esteem. Id. Jenkins was alert, pleasant, and cooperative, although she exhibited a "down"

---

[2] "GAF rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010); see Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 34 (4th ed. 2000). "A GAF in the range of 51 to 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).' " Zabala, 595 F.3d at 406 n.3 (alteration in original) (quoting DSM-IV, at 34). But see Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, at 16 (5th ed. 2013) (abandoning the GAF score because of concerns about "its conceptual lack of clarity" and "questionable psychometrics in routine practice").

affect and was slightly hypoactive. Tr. 642. Jenkins declined to use sertraline and instead requested talk therapy treatment, which Jenkins believed would be beneficial to her condition. Id. Dr. Suojanen predicted that treatment with talk therapy and medication would likely yield a "fair to good" prognosis. Tr. 643.

In Part B of the Mental Health Questionnaire, Dr. Suojanen provided the following descriptions of the degree of Jenkins's mental impairments: Jenkins had "[n]o or slight" restriction in her activities of daily living. Tr. 643. Jenkins had "[m]arked difficulties" in maintaining social functions. Tr. 644. Jenkins "[f]requently experienced" deficiencies in concentration, persistence, or pace, and she experienced anxiety and confusion "at times." Id. And "once or twice" Jenkins experienced episodes of decompensation in which she felt as if she was having a nervous breakdown and considered hospitalization. Id.

In Part C of the Mental Health Questionnaire, Dr. Suojanen reported that Jenkins would have "[m]arked" limitation in her ability to satisfy an employer's normal quality, production, and attendance standards. Tr. 645. Dr. Suojanen also noted that Jenkins would have "[m]oderate" limitations in her ability to respond to pressures and to perform complex tasks at work. Id.

On June 5, 2013, Dr. Posner completed a questionnaire detailing Jenkins's issues with her foot (the "Foot Health

Questionnaire"). Tr. 787-92. Dr. Posner treated Jenkins nine times between 2011 and July 2013. Tr. 332-33, 412, 443, 483, 509, 553, 561, 562, 577. In the Foot Health Questionnaire, Dr. Posner listed various limitations that Jenkins's foot pain placed on her ability to perform physical acts such as sitting, standing, walking, and climbing stairs. Tr. 787-90. However, Dr. Posner answered "No" when asked whether Jenkins's foot limitations have "lasted or will . . . last for 12 consecutive months." Id.

Dr. Suojanen met regularly with Jenkins from July 2013 through April 2014. Tr. 533, 554, 647, 683, 733, 757, 764. Dr. Suojanen observed during these meetings that Jenkins's depression, anxiety, and stress reduced. Tr. 534, 555, 648, 683, 733, 757. The records from these meetings reveal that Jenkins began to take sertraline and engage in talk therapy. Tr. 534, 648-49, 683-84, 733-35. These treatments managed Jenkins's mood disorders. Id.

**B.**

Jenkins filed a protective claim for SSI on November 28, 2012, alleging a disability that began the same day. Jenkins alleged that she was unable to work because she experiences, among other things, depression, post-surgical pain in her right shoulder, and pain in her left leg. Tr. 182; see Tr 161-69. Jenkins requested and was granted a hearing before an ALJ. Tr.

98, 99-106. The hearing was held on August 21, 2014. Jenkins, who was represented by a paralegal, together with Dr. Bernard Gussoff, a medical expert, and Miriam Green, a vocational expert, all testified. Tr. 51-81, 124.

Jenkins testified first. She said that she still has shoulder pain and heel spurs, although she is now able to move her right arm freely and touch her head. Tr. 61, 62, 74. Jenkins estimated that she can carry about "50 [pounds], 40 [pounds], like a gallon of milk." Tr. 70. She then clarified that she can carry "[p]robably" about ten pounds. Id. Jenkins testified that she still has foot pain, but that treatment with cortisone shots was "helpful." Tr. 74-75. Jenkins also stated that she meets regularly with a psychiatrist and takes medication to treat her depression. Tr. 64. Jenkins said both of those psychiatric treatments are helpful. Tr. 64-65.

Dr. Gussoff testified after Jenkins. Dr. Gussoff's opinions were based on his review of medical records and on Jenkins's hearing testimony. Dr. Gussoff did not treat or examine Jenkins in a clinical setting. See Tr. 76. Dr. Gussoff concluded that Jenkins was not disabled. Tr. 77. With regard to Jenkins's shoulder pain, Dr. Gussoff found that she is "able to use her upper extremity for daily household chores" and "bathing." Tr. 76. Dr. Gussoff concluded that Jenkins's depression "does not

meet any of the major parameters like hospitalization, social impairment, [impaired] daily activities, or concentration." Id.

Green testified last. The ALJ asked Green whether any jobs exist in the economy for someone of Jenkins's approximate age who could perform work that requires simple and repetitive tasks, occasional interaction with others, concentration for two-hour intervals with fifteen-minute periods to regroup, fingering with the left hand, and lifting no more than ten pounds with the right arm. Tr. 78-79. Green replied that such person could be an usher, a linen room attendant, a price marker, or a mail clerk. Tr. 79-80. However, if a person could only occasionally concentrate and was off task one-third of the time due to bouts of depression, there would be no available jobs. Tr. 80.

The ALJ issued a lengthy written denial of Jenkins's claim for SSI on December 29, 2014. Tr. 6-44. The ALJ found that Jenkins had not engaged in substantial gainful activity since the date of her claim. Tr. 11. The ALJ found that Jenkins had the following severe impairments: right shoulder disorder, bilateral carpal tunnel syndrome, right middle trigger finger, obesity, and mood disorders. Tr. 11-20.[3] But the ALJ found that Jenkins's impairments do not meet or medically equal the

_____

[3] Jenkins does not object to the ALJ's analysis of her bilateral carpal tunnel syndrome, right middle trigger finger, or obesity, all of which the ALJ found not to be disabling.

impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.
Tr. 20-22. The ALJ determined that Jenkins is capable of
performing light work that involves simple tasks, limited
concentration, occasional social interaction, and lifting of no
more than ten pounds with her right arm. Tr. 22-38. Based on the
testimony of the vocational expert, the ALJ found that a
significant number of jobs exist in the economy that can
accommodate Jenkins's work limitations, such as an usher, price
marker, and mail clerk. Tr. 39. As a result, the ALJ concluded
that Jenkins is not disabled for purposes of the Social Security
Act. Id.[4]

---

[4] "Light work involves lifting no more than 20 pounds at a time with
frequent lifting or carrying of objects weighing up to 10 pounds. Even
though the weight lifted may be very little, a job is in this category
when it requires a good deal of walking or standing, or when it
involves sitting most of the time with some pushing and pulling of arm
or leg controls." 20 C.F.R. § 416.967(b). If Jenkins had the residual
functional capacity to perform the full range of light work and no
non-exertional limitations, then the Medical-Vocational Rules
(commonly referred to as the "Grids") would have dictated a finding of
"not disabled." See 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.7.
However, a limitation of lifting no more than ten pounds at any time
may indicate a residual functional capacity of sedentary work and
result in a finding of "disabled" pursuant to the Grids. See id.
§ 202.10. When a claimant's exertional limitations result in a
residual functional capacity that falls between two of the limitation
categories listed at 20 C.F.R. § 416.967(b), as Jenkins's did here,
the ALJ should consult a vocational expert. See SSR 83-12 (1983); see
also Moore v. Apfel, 216 F.3d 864, 870 (9th Cir. 2000); Miller v.
Astrue, No. 11-cv-4103, 2013 WL 789232, at *7-*8 (E.D.N.Y. Mar. 1,
2013). That is what the ALJ did in this case. The ALJ provided the
vocational expert with a hypothetical that involved a person who had a
residual functional capacity to perform light work but limited to
lifting no more than ten pounds with the dominant right arm. The
vocational expert found that there were substantial jobs available for
such a person.

In reaching her conclusion that Jenkins was not disabled, the ALJ paid particular attention to Jenkins's depressive disorder. The ALJ found that Jenkins does not have "persistent debilitating psychiatric symptoms." Tr. 32. In coming to that conclusion, the ALJ assessed Dr. Suojanen's records from her April 30, 2013 psychiatric examination of Jenkins and the May 2, 2013 Mental Health Questionnaire. Tr. 33-34. While the ALJ did not name the psychiatrist, the ALJ noted that the April 30 psychiatric examination was conducted at Montefiore Medical Center. Tr. 33. The ALJ acknowledged that the psychiatrist diagnosed Jenkins with depression and anxiety, and that the psychiatrist believed Jenkins had marked difficulties in social functioning and frequent difficulties with concentration. Tr. 33-34. But the ALJ determined that those opinions were "unsupported by objective clinical findings and . . . inconsistent with both the evidence of the record and the claimant's activities," and assigned the psychiatrist's views only "some weight." Tr. 34. The ALJ found that the psychiatrist's opinions conflicted with Jenkins's moderate GAF score and with the psychiatrist's own prognosis of Jenkins's mental health. Id. The ALJ noted that records from Dr. Suojanen's multiple psychiatric examinations of Jenkins following the completion of the Mental Health Questionnaire reflected that Jenkins's mood disorders could be managed

effectively with medication and talk therapy. Tr. 34-35, 36-37. The ALJ also cited Dr. Mahony's finding that Jenkins is capable of functioning on a daily basis notwithstanding her mood disorders, Tr. 35, and Jenkins's admission in the Function Report that her mood disorders do not interfere "significantly . . . with the performance of activities of personal care and daily living," tr. 38.

Jenkins petitioned the Social Security Appeals Council for review. Tr. 4-5. Her petition was denied, and the ALJ's decision became the final decision of the Commissioner. Tr. 1-3.

This appeal followed.

## II.

A court may set aside a determination by the Commissioner only if it is based on legal error or is not supported by substantial evidence in the record. See 42 U.S.C. §§ 405(g), 1383(c)(3); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also see also Mejia v. Berryhill, No. 16-cv-6513 (JGK), 2017 WL 3267748, at *3 (S.D.N.Y. July 31, 2017).

To be eligible for SSI, a claimant who is younger than 65 years of age and not blind must qualify as disabled within the meaning of the Social Security Act. 42 U.S.C. § 1382(a)(1); see id. § 1382c(a)(1)(A). A claimant qualifies as disabled if she suffers from any "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months" that prevents her from engaging in any "substantial gainful activity." Id. § 1382c(3)(A).[5]

The Commissioner's regulations provide a five-step inquiry to determine if a claimant is disabled: At Step One, the Commissioner considers whether the claimant is engaged currently in substantial gainful activity. If not, the Commissioner proceeds to Step Two and considers whether the claimant has a severe impairment that limits the claimant's mental or physical ability to do basic work activities. If the claimant has a severe impairment, the Commissioner proceeds to Step Three, which requires determining, based solely on medical evidence, whether the claimant has an impairment listed in Appendix 1 of the regulations. If so, the Commissioner shall consider the

---

[5] Disability insurance benefits under Title II of the Social Security Act and SSI benefits under Title XVI of the Act have similar definitions of disability. Barnhart v. Walton, 535 U.S. 212, 214 (2002); see 42 U.S.C. § 423(d)(1)(A); see also Mejia, 2017 WL 3267748, at *3. Cases under 42 U.S.C. § 423 are cited interchangeably with cases under 42 U.S.C. § 1382c(a)(3). See Hankerson v. Harris, 636 F.2d 893, 895 n. 2 (2d Cir. 1980).

claimant disabled without considering the vocational factors of age, education, and work experience. If the impairment is not listed in the regulations but is determined to be a severe impairment, Step Four requires the Commissioner to determine the claimant's residual functional capacity ("RFC") and, based on that determination, ask whether, despite the claimant's severe impairment, the claimant can perform the claimant's past work. Finally, if the claimant is unable to perform such past work, at Step Five, the Commissioner determines whether there is other work which the claimant could perform. 20 C.F.R. §§ 404.1520(a), 416.920(a); see Shaw, 221 F.3d at 132; see also Moreira v. Colvin, No. 13-cv-4850 (JGK), 2014 WL 4634296, at *4 (S.D.N.Y. Sept. 15, 2014). The claimant bears the burden of proof through the first four steps; the burden shifts to the Commissioner at the fifth step. Shaw, 221 F.3d at 132.

The "treating source rule" requires an ALJ deciding whether the claimant is disabled to consider the opinion of the claimant's treating doctors. 20 C.F.R. § 416.927(c)(2); see Shaw, 221 F.3d at 134.[6] Traditionally—but not always—an ALJ must accord great weight to such opinions. See Shaw, 221 F.3d at 134. An ALJ must accord controlling weight to a treating source's

---

[6] Section 416.927 applies to Jenkins's claim. 20 C.F.R. § 416.920c provides new rules for the medical opinions of treating sources for claims filed after March 27, 2017. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5880 (Jan. 18, 2017).

opinion when it is well-supported by medically acceptable
clinical and laboratory diagnostic techniques and not
inconsistent with substantial evidence of record. 20 C.F.R.
§ 404.1527(c)(2). An ALJ may accord a treating source's opinion
less-than-controlling weight if the ALJ identifies "good
reasons" for the weight the ALJ assigns the opinion. 20 C.F.R.
§ 416.927(c)(2); see Shaw, 221 F.3d at 134; see also Burton-Mann
v. Colvin, No. 15-cv-7392 (JGK), 2016 WL 4367973, at *5
(S.D.N.Y. Aug. 13, 2016).

      "[T]he ALJ must comprehensively set forth [the] reasons for
the weight assigned to a treating physician's opinion." Burgess
v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (internal quotation
marks omitted). An ALJ must consider "(1) the frequen[c]y,
length, nature, and extent of treatment; (2) the amount of
medical evidence supporting the opinion; (3) the consistency of
the opinion with the remaining medical evidence; and (4) whether
the physician is a specialist" before assigning less-than-
controlling weight to a treating source's opinion. Selian v.
Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam). An ALJ
need not reference on the record each of these factors relevant
to override a treating source's opinions. See Halloran v.
Barnhart, 362 F.3d 28, 32-33 (2d Cir. 2004) (per curiam); cf.
Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir.
2012) (per curiam) ("An ALJ does not have to state on the record

every reason justifying a decision."). A court's task on an appeal from a Social Security decision is not to search for specific incantations from the ALJ but to determine whether the Commissioner's decision in substance reveals that the ALJ "considered the treating physician's opinion and explained the consistence of [that] opinion 'with the record as a whole.' " Halloran, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(4)).

### III.

Jenkins argues that the ALJ's determination that she can perform limited work contains three violations of the treating source rule.

### A.

Jenkins's principal argument is that the ALJ erroneously disregarded Dr. Suojanen's opinions at Steps Three and Four of the disability analysis.

Step Three required the ALJ to determine whether Jenkins's mood disorders meet or equal the depressive disorders listed in section 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. § 416.920(a)(4)(iii).[7] Section 12.04 provides in

---

[7] The Commissioner revised section 12.04 effective as of January 17, 2017. See Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,138, 66,176 (Sept. 26, 2016). The parties agree that the predecessor version of section 12.04, which was in effect at the time of the ALJ's decision, applies in this case. See id. at 66,138 n.1 ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.").

relevant part that a claimant's mental impairment qualifies as a depressive disorder only if the claimant exhibits at least two of the following Category B criteria: (1) "marked" restriction of activities of daily living, (2) "marked" difficulties in maintaining social functioning, (3) "marked" difficulties in maintaining concentration, persistence, or pace, and (4) "repeated" episodes of decompensation, each of extended duration. Step Four required the ALJ to assess Jenkins's RFC in light of her mood disorders. See 20 C.F.R. § 416.920(a)(4)(iv).

At Step Three, the ALJ found that Jenkins's mood disorders did not satisfy section 12.04 because they cause only mild restrictions in her daily activities, moderate difficulties in her social functioning and ability to concentrate, and she has experienced no episodes of decompensation of extended duration. Tr. 21-22.[8] At Step Four, the ALJ carefully analyzed the degree of limitation that Jenkins suffered as a result of her mood disorder and found that Jenkins's RFC permits her to perform work that requires occasional social interaction based on a lack of evidence of "persistent debilitating psychiatric symptoms."

---

[8] A claimant could also have a listed impairment under § 12.04 if the Category C criteria are met. The Category C criteria relate to a medically documented history of a chronic affective disorder of at least two years duration with repeated episodes of decompensation, each of extended duration, or which could be expected to cause such events or a history of one or more years of inability to function outside a highly supportive living arrangement. The ALJ found that the Category C criteria were not met, Tr. 22, and Jenkins does not dispute that finding.

Tr. 32; see Tr. 22. These findings conflicted with the opinions of Dr. Suojanen, who concluded in the Mental Health Questionnaire that Jenkins had no restrictions in daily living, "marked" difficulties in maintaining social functioning, that she "[f]requently experienced" deficiencies in concentration, persistence, or pace, and that she experienced one or two episodes of decompensation. Tr. 644.

The ALJ considered each of the factors necessary to afford Dr. Suojanen's opinions only "some weight," rather than "controlling weight." Tr. 20-38; see Selian, 708 F.3d at 418.

First, the ALJ considered the "frequen[c]y, length, nature, and extent of [Dr. Suojanen's] treatment" of Jenkins prior the completion of the Mental Health Questionnaire. See Selian, 708 F.3d at 418. The ALJ reviewed in depth Jenkins's history of mental health treatment for the periods before and after Dr. Suojanen completed the Questionnaire. Tr. 32-35. And the ALJ indicated that the April 30, 2013 examination and Mental Health Questionnaire yielded treatment diagnoses, rather than consultative diagnoses. The ALJ did not state specifically that the doctor who rendered those diagnoses was a treating source, but the ALJ did indicate that she reviewed the records from the Montefiore Medical Center, Jenkins's treatment facility, for the period from February 2010 to March 2014, and the ALJ noted that the April 30, 2013 diagnoses were made at Montefiore. Tr. 32,

34; cf. Tr. 35 (noting that another psychiatric evaluation was completed by a "consultative examiner").

Second, the ALJ considered "whether [Dr. Suojanen] is a specialist." See Selian, 708 F.3d at 418. The ALJ noted that Dr. Suojanen's various examinations of Jenkins were "[p]sychiatry visits," tr. 34, and that the April 30, 2013 examination in particular was also a "psychiatry visit," tr. 33. Cf. Tr. 36 (noting that other notes were completed by a "social worker[]").

Third, the ALJ considered the "the amount of medical evidence supporting [Dr. Suojanen's] opinion." See Selian, 708 F.3d at 418. The ALJ reviewed in considerable detail the opinions in the Mental Health Questionnaire and Dr. Suojanen's notes associated with the April 30 examination. Tr. 33-34. Based on that review, the ALJ reasonably found that Dr. Suojanen's opinions were "unsupported" by objective clinical findings and inconsistent with the evidence in the record, including Jenkins's admissions. Tr. 34. That finding is supported by substantial evidence.

Finally, the ALJ considered "the consistency of [Dr. Suojanen's] opinion with the remaining medical evidence." See Selian, 708 F.3d at 418. The bulk of the ALJ's mental health discussion is spent identifying the medical evidence in the record that was inconsistent with Dr. Suojanen's opinions. Tr. 34-38. The ALJ found that Dr. Suojanen's opinions conflicted

with Jenkins's GAF score, the views of the consultative

psychologist, Jenkins's admissions in the Function Report, and

improvements in Jenkins's mental health condition with the aid

of medication and talk therapy. Id. These inconsistency findings

are supported by substantial evidence.

Jenkins argues that remand is necessary because the ALJ did

not cite explicitly the treating source rule or the factors

required to override a treating source's opinions. See Tr. 20-

38. However, an ALJ's failure to reference the treating source

rule explicitly does not always require remand. In Halloran v.

Barnhart, the Court of Appeals for the Second Circuit affirmed a

denial of Social Security benefits even though it was "unclear

on the face of the ALJ's opinion whether the ALJ considered (or

even was aware of) the applicability of the treating physician

rule." 362 F.3d at 32. The Halloran court "deduce[d] that the

ALJ considered the treating physician's opinion and explained

the consistency of [that] opinion 'with the record as a

whole,' " and affirmed on the principle that whether "the ALJ

applied the substance of the treating physician rule," not

whether the ALJ's decision included certain incantations,

controls the analysis on a Social Security appeal. Id. (emphasis

added; quoting 20 C.F.R. § 404.1527(d)(4)).

Similarly here, while the ALJ did not cite the treating

source rule, she explicitly found that the Mental Health

Questionnaire from Montefiore Medical Center was "unsupported by objective clinical findings and . . . inconsistent with both the evidence of record and [Jenkins's] activities." Tr. 34. The ALJ determined that the findings in the Questionnaire were only entitled "some weight." Id. The record reflects that the ALJ reviewed the appropriate considerations, applied the substance of the treating source rule, and came to a decision regarding Jenkins's mental state that is supported by substantial evidence. That is sufficient under the prevailing case law.[9]

**B.**

Jenkins next contends that the ALJ erroneously disregarded Dr. Toh's opinion regarding her lifting capabilities.

As an initial matter, the ALJ did not reject the bulk of Dr. Toh's opinion. Dr. Toh wrote in the Shoulder Health Questionnaire in May 2013 that Jenkins is limited to lifting less than ten pounds. Tr. 637. The ALJ found that Jenkins has

---

[9] That the ALJ reviewed Dr. Suojanen's opinions in Step Four rather than Step Three is no basis for remand. The ALJ need not explain twice why it rejected a single set of medical opinions. See Brault, 683 F.3d at 448. In any event, it is not clear that Jenkins would be entitled to a disability finding at Step Three even accepting Dr. Suojanen's opinions. While Dr. Suojanen found that Jenkins's disorders caused a "marked" difficulty in social functioning, Dr. Suojanen did not state clearly that Jenkins exhibited a second symptom listed in the Category B criteria in section 12.04 of Appendix 1. Dr. Suojanen found that Jenkins's difficulties in daily activities were slight and that Jenkins experienced only one or two instances of decompensation in which she considered going to the hospital. Dr. Suojanen did opine that Jenkins experienced "[f]requent[]" deficiencies in concentration, Tr. 644, but it is not clear from the record that has the same meaning as "marked" for purposes of section 12.04.

the RFC to perform work that "does not require lifting/carrying more than 10 pounds with the right dominant arm." Tr. 22 (emphasis added). Thus, the ALJ's and Dr. Toh's opinions diverge only on whether Jenkins can lift ten pounds exactly. Jenkins does not explain how this limited difference affected the ALJ's assessment of her RFC or the substantial work available for someone in Jenkins's condition. There is therefore no showing that the ALJ's ultimate disability finding would have been different had she accepted fully Dr. Toh's lifting restriction.

In any event, the ALJ's decision contains an adequate explanation of why she did not afford controlling weight to Dr. Toh's opinion that Jenkins could only lift or carry less than ten pounds. The ALJ acknowledged that Dr. Toh reached her opinion while working at Jenkins's treatment facility, the Montefiore Medical Center. See Selian, 708 F.3d at 418.[10] But the ALJ found Dr. Toh's opinion unsupported by and inconsistent with the objective record evidence. See Tr. 25. Relying on Dr. Mescon's report and Montefiore medical records, the ALJ found that Jenkins's shoulder pain can be controlled or ameliorated through medication. Tr. 25; see Tr. 254, 474. The ALJ noted that Jenkins admitted she can lift up to fifty pounds. Tr. 25; see Tr. 70, 193. While fifty pounds may have been an exaggeration,

---

[10] Jenkins does not argue that the ALJ should have considered Dr. Toh a shoulder specialist for purposes of the treating source rule.

Jenkins admitted in her hearing testimony that she could lift
ten pounds. Tr. 24. And the ALJ found that ten pounds was the
limit Jenkins could lift. The inconsistencies between the
evidence in the record and Dr. Toh's conclusion that Jenkins
could only lift less than ten pounds is sufficient to explain
the ALJ's decision to refuse to accord that opinion from Dr. Toh
controlling weight and to accord it only "little weight." Tr.
25.

### C.

Finally, Jenkins argues that the ALJ violated the treating
source rule with regard to Dr. Posner's opinion that she had
limitations on sitting, standing, walking, and climbing stairs
as a result of foot pain.

After considering Dr. Posner's opinions, the ALJ properly
found Jenkins's foot pain was not a severe impairment. See Tr.
12. The ALJ noted that Jenkins's treatment records from
Montefiore Medical Center for the period of April 2013 to July
2013 indicate she had experienced left foot pain caused by heel
spurs and plantar fasciitis. Id. But the records also revealed
that Jenkins's foot pain was "intermittent" and that she had
ceased complaining of such pain by March 2014. Id.; see Tr. 751.
This was confirmed by: (1) Dr. Posner, who wrote in the June
2013 Foot Health Questionnaire that Jenkins's foot limitations
have not "lasted [and] will [not] . . . last for 12 consecutive

months," and that Jenkins could stand for three hours in an eight-hour workday and walk for three hours in an eight-hour workday, Tr. 787, 790; (2) Dr. Toh, who opined in treatment records that Jenkins had no limitations on standing or walking, Tr. 637; and (3) by Jenkins's testimony at the hearing that cortisone treatment helped manage her foot pain, Tr. 74-75. Therefore, whatever weight they should have been accorded by the ALJ, Dr. Posner's foot pain opinions did not support a disability finding, and the ALJ did not err in concluding that Jenkins's foot pain was not a severe impairment. See 42 U.S.C. § 1382c(3)(A) (providing that an impairment qualifies as severe for purposes of SSI if it "can be expected to result in death or . . . has lasted or can be expected to last for a continuous period of not less than twelve months").

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) is **granted**; Jenkins's cross-motion is **denied.** The Clerk is directed to enter judgment dismissing this case. The Clerk is also directed to close this case.

**SO ORDERED.**

Dated:     **New York, New York**
              **September 20, 2017**

                                         **John G. Koeltl**
                          **United States District Judge**